Filed 3/6/15  P. v. Parker CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DONALD RAY PARKER,<br><br>    Defendant and Appellant. | H038898<br>(Monterey County<br> Super. Ct. No. SS110136A) |

Donald Ray Parker (appellant) appeals his conviction for the murder of Dwayne Jay Choates Jr.  For reasons that follow, we affirm the conviction.

On April 2, 2012, the Monterey County District Attorney filed an amended information in which the prosecutor alleged that appellant committed murder in violation of Penal Code section 187 [1]; that appellant intentionally killed the victim by means of lying in wait (§ 190.2, subd. (a)(15) (hereafter the lying-in-wait special circumstance); that during the commission of the crime appellant intentionally and personally discharged a firearm within the meaning of section 12022.53, subdivision (d); and that prior to the commission of the offense appellant had suffered a prior conviction for robbery (§ 211) within the meaning of section 1170.12, subdivision (c)(1), which was a serious felony within the meaning of section 667, subdivision (a).

On April 18, 2012, a jury found appellant guilty of first degree murder and found true the lying-in-wait special circumstance and the firearm use allegation.  In a separate

---

[1]     All unspecified section references are to the Penal Code.

court trial, Judge Pamela L. Butler found true the prior strike and prior serious felony allegations.

On October 3, 2013, the court sentenced appellant to state prison for life without the possibility of parole for the murder, plus 30 years—25 years to life for the firearm use and five years for the prior serious felony. Appellant filed a notice of appeal the same day.

On appeal, appellant mounts various challenges to his conviction. Specifically, he argues that there was not substantial evidence to support his conviction for first degree murder and the lying-in-wait special circumstance; that the trial court erred when it instructed the jury with CALCRIM No. 358; that the trial court erred in instructing the jury with CALCRIM No. 359; that the trial court erred in refusing to give a voluntary manslaughter instruction; that the trial court erred in instructing the jury regarding first degree murder because the instructions were based on unsupported theories; and finally, that there was cumulative error. We are not persuaded by appellant's arguments.

We set forth in detail the facts underlying appellant's conviction in our discussion of his contention that the evidence was insufficient to support his murder conviction and the lying-in-wait special circumstance. Suffice it to say here that on November 10, 2010, Dwayne Choates died from multiple gunshot wounds; the shooting occurred at the Del Monte Manor apartment complex in Seaside.

*Discussion*

*Sufficiency of the Evidence*

As noted, appellant contends that there was insufficient evidence to support his murder conviction and the lying-in-wait special circumstance.

In reviewing the sufficiency of the evidence on appeal, we determine whether substantial evidence exists such that any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 575-578 (*Johnson*); see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)

2

In making this determination, we presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment and resolve conflicts in favor of the prosecution. (*Johnson*, *supra*, at p. 576.) We do not substitute our evaluation of the credibility of the witness " 'unless there is either a physical impossibility that the testimony is true or that the falsity is apparent without resorting to inferences or deductions. [Citations.]' [Citation.]" (*In re Andrew I.* (1991) 230 Cal.App.3d 572, 578.) The test on appeal is whether there is substantial evidence that would support a guilty finding. (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) Substantial evidence is evidence that is "reasonable, credible, and of solid value. . . ." (*Johnson*, *supra*, at p. 578.)

Accordingly, we are required to set forth the evidence in the light most favorable to the judgment. (*People v. Valencia* (2002) 28 Cal.4th 1, 4, overruled in part on other grounds in *People v. Yarbrough* (2012) 54 Cal.4th 889, 894; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends].)

Marissa Bugg had known appellant for approximately four years at the time of trial in 2012. Appellant is the father of her daughter. In November 2010, she lived with appellant in "1538 Apartment H" in Del Monte Manor; the apartment was a corner apartment with a balcony that looked out onto Yosemite Street. On November 10, 2010, appellant came home from work; he had plans to go out to a club. Bugg planned to spend time with her friend Jasmine Smith at Smith's apartment; they were going to drink wine coolers. Bugg said that they did not plan to have anybody else there.

After appellant left the apartment for the club, Bugg went to Smith's apartment. Bugg was surprised to see Choates there. Choates was Smith's cousin; he and Bugg had dated in the past and they remained good friends. Bugg said she telephoned Choates

3

every couple of days, but they were not romantically involved and were not having an affair.  Bugg knew that Smith and Choates were close, but she thought that the plan was for her and Smith to drink wine coolers together.  Bugg and Choates talked about "old times" and she sent him a picture of his son from her telephone because he had lost his old telephone.  Smith reminded her that she was supposed to bring the wine coolers, so Bugg returned to her apartment, picked up three wine coolers, and returned to Smith's apartment.  Bugg and Choates drank the wine coolers and talked for approximately 10 minutes.  Choates was looking at photographs and was receiving and sending text messages on his telephone.  Choates drank his wine cooler quickly and left; he said he would "be right back."  This was something he said often and then did not return.  Choates tried to leave through the apartment's back door, but Smith told him to use the front door because it was late and she did not want to open the back door.  Choates went out the front door and walked to the stairs.  Within seconds, Bugg heard "several gunshots"; she heard Choates shout, "Jasmine call the police, call the police, I got hit, I got hit."  Smith told Bugg to call the police, hold her son, and get on the floor.  Smith went outside and Bugg remained in the apartment on the ground with Smith's son.

Bugg had been on the floor for 10 to 15 minutes when the police knocked on the door of the apartment; they asked her what she had heard.  After speaking with the police, Bugg telephoned her mother and brother.[2]  Bugg wanted her brother to contact appellant "to see where he was."  Bugg had had appellant's telephone turned off several days earlier because he ignored her calls, while the bill, which she paid, indicated that he talked to several other people.  Bugg was concerned that appellant was talking to women and having affairs; she expressed that concern to him.

---

[2]     Bugg's brother testified in this case under the pseudonym "Witness Number Two."  For the sake of brevity we refer to him and another witness, who also testified under a pseudonym—"Witness Number One"— as Witness Two and Witness One.

Bugg and Smith unsuccessfully tried to find a ride to the hospital so they could be with Choates. Smith telephoned her mother, who came over and got her. Bugg went to her apartment, but left around 7:00 a.m. the next day to walk to her mother's house. She left her apartment because she was afraid to be alone.[3] Appellant had not returned to the apartment.

Bugg testified that appellant never told her he was worried about her relationship with Choates. However, appellant made "assumptions" that Choates was Bugg's boyfriend; he would assume that if Bugg was going to Smith's apartment she was going there to see Choates. Appellant would comment that she was "probably going over there to be with him." If they drove by Choates's car, appellant would tell Bugg to say "What's up, to your boyfriend." Appellant "never really knew" that she telephoned Choates. Once when she telephoned Choates, appellant "didn't even really know it was him, but . . . made assumptions and would say stuff in the background." Bugg said that appellant was jealous of Choates. On the night of the shooting, it would have been possible for appellant to have seen Choates's car where it was parked on Yosemite Street.

Bugg recalled that on January 1, 2011, appellant telephoned her from Salinas where he was in the county jail. The 20-minute recorded telephone call was played for the jury. In the recording, appellant referred to the wine coolers and Choates; he said "You . . . was at a friend's . . . kicking it with that nigger behind my back." In the recording, Bugg denied that she was "kicking it with" Choates; appellant responded, "That's why-the fuck you went to the house and got the fucking wine coolers and went back, what the fuck is you talking about." According to Bugg, this was the kind of jealousy that appellant displayed when referring to Choates. In the recorded conversation, appellant referred to telephone calls that Bugg made in front of him;

---

[3] Bugg's daughter was with Bugg's mother.

Bugg explained that for every telephone call she made in front of appellant he would assume that she was talking to "some guy" or Choates.

The prosecutor showed Bugg exhibit No. 63, a photograph of her cellular telephone with a series of text messages on it. Bugg said that there were messages from appellant, which she received two days after the shooting. The message from appellant read, "Dont know and no if cuz was alive u wont be actn the way u are." Bugg explained that she texted back, "Yes i would i swear i been tryin to have sex kiss . . ." Appellant responded, "No it ain't don't play . . . i been askin you all the ti. . ." Bugg clarified that the conversation was in response to a text she had sent appellant in which she said, "I love you." Bugg said she understood from this conversation that appellant was telling her that when Choates was around she treated him (appellant) differently; and she believed that appellant was telling her that she said she loved him (appellant) only because Choates was gone.

Bugg acknowledged that she did not want to be in court and was there because she had been subpoenaed. Regarding her current relationship with appellant, Bugg said that they were still together, visited weekly, and talked on the telephone. Their relationship was "[s]till the same."

Jasmine Smith testified that Choates was her cousin, but he was "more like a big brother." Choates visited her apartment often. On November 10, 2010, Choates called Smith and asked if he could come over. There was no specific reason for the request. As usual, he just wanted to "come and hang out and eat." Choates arrived at her apartment approximately 30 to 45 minutes before the shooting. Choates talked with Smith and played with Smith's son. Bugg called Smith and asked what Smith was doing. Smith told her that she was sitting with Choates and Bugg asked if she could come over; Smith said yes. When Bugg arrived they had an "irrelevant" conversation. Bugg showed Choates a picture of his son that was on her telephone. Choates asked Bugg to send it to him, which she did. Bugg asked Smith if she wanted a drink. At first Smith said no, but

6

then changed her mind when Bugg said she had only wine coolers. Since Choates was there, Bugg said she would get three wine coolers. By this time, Bugg had been in the apartment about 10 minutes. Bugg left and returned about three minutes later with the wine coolers. Choates drank his wine cooler first. Smith and Bugg were sitting on the bed talking when Choates said he would be right back. Choates started to go out the back door of the apartment because it provided a quicker route to someone he wanted to visit, but Smith told him to use the front door for safety reasons; Choates left by the front door.

Less than a minute after Choates left, Smith heard gunshots. Smith told Bugg, who was holding Smith's son, to get down and telephone 911. Smith took the telephone when Bugg said that she did not know what to say. Repeatedly, Choates was screaming "Jasmine, Jasmine, help, I'm hit. Call 911. I'm hit." About a minute later, Smith went outside and saw Choates lying on the floor surrounded by neighbors. Smith telephoned Choates's father and he ran down from the top parking lot. Smith knelt beside Choates and held him in her arms. Smith described Choates's state as "critical"; he was "going into shock." Smith tried to keep Choates awake and talking; he kept telling her to call 911. Smith could hear the ambulance coming and was told the police were on their way. The police arrived two to five minutes later. Before the police arrived, Smith continued her efforts to keep Choates awake, but he just kept saying he could not breathe and kept asking for 911. Smith did ask him who shot him, but it was difficult for him to speak; he just "kind of squeezed" Smith.

When the police arrived, they pulled Smith away from Choates and asked her if she had seen anything or knew if the suspect was still around. Smith told them no. Smith returned to her apartment and left with her mother, who drove her to the hospital. At the hospital, Smith learned that Choates was already dead. Smith spoke with the police. At first, she did not tell them everything that she included in her trial testimony because she was "really nervous and scared." Smith did not tell the police that she and Bugg had been in the apartment together because she did not think it was relevant to the shooting.

7

Smith remembered that as soon as the gunshots started, Bugg said, "No, no"and started crying. Smith repeated that she told Bugg to telephone 911 and get on the ground; Smith said that she snatched Bugg's telephone and ran out of the apartment when Bugg said she did not know what to tell them. Smith had her own telephone in her shirt pocket along with Bugg's telephone. When Bugg came outside, repeatedly she said, "I need my phone, I need my phone, I need my phone." Smith gave Bugg her telephone and Bugg went back inside.

Smith said that she knew that Choates and Bugg had dated previously. Based on her own observations and conversations with Choates, she understood that Choates and Bugg had "no contact." Choates never indicated that he and Bugg were having an affair. Bugg told Smith that she considered Choates to be a friend, and that appellant was upset that she still wanted to have contact with Choates. On one occasion, Bugg had appellant on speakerphone and asked him for a ride to the pharmacy. Appellant replied, "No. You're over there, ask that nigger for a ride." Appellant sounded annoyed. According to Smith, "over there" meant her house.

Witness Two is Bugg's 23-year-old brother. Appellant, whose nickname was "R.J" or "True" was his best friend and the father of Witness Two's niece. Appellant and Witness Two worked together and Witness Two got his job through appellant. Not only were they best friends, but they had lived together at the house of Witness Two's mother for "quite some time." Witness Two said that appellant "looked out for" him. Witness Two knew Choates by name, but had never spoken to him.

In 2010, Witness Two lived alone at Del Monte Manor. His sister and appellant lived there too. Smith lived in apartment 1520 and appellant and his sister lived nearby in apartment 1538. On November 10, 2010, Witness Two and appellant planned to go to a club, the Blue Finn in Monterey, with a couple of friends. They usually arrived at the club around 10:30 p.m. That night, appellant came to Witness Two's apartment to see if he was ready and asked him if he had money to buy beer before they went to the club.

8

Since Witness Two was not ready, they agreed to meet up later. The transmission in Witness Two's car was broken so he intended to get a ride from appellant.

After appellant left Witness Two's apartment, Witness Two went to his car to get some clothes. As he walked to his car, Witness Two saw appellant in a walkway between driveways one and two of the apartment complex.[4] The walkway was equidistant from Smith's and Bugg's apartments. Appellant was sitting on a box smoking a cigarette. Appellant was wearing a black jacket with "his hood up . . . ." Witness Two asked appellant to share his cigarette; he did. Witness Two thought that appellant's presence in the walkway was unusual because they were supposed to be going out to a club. Appellant appeared to be "a little mad." After a couple of minutes passed, Witness Two told appellant he was going to his car. As Witness Two started to walk away, he heard footsteps "instantly" followed by "a lot of" gunshots, "maybe about in between six, seven." After hearing the footsteps, Witness Two turned back and saw "R.J." with his hood on shooting from right to left; Witness Two saw "the flashes from the gun." When asked if he was certain that appellant was the person shooting, Witness Two replied, "Man, I'm positive. I do not want to be here. Especially I don't want to do this." Witness Two was "[a] hundred percent" certain that appellant was the shooter. Witness Two could not recall if he saw the shooter's face, nor whether he had testified at the preliminary hearing that he did not see the shooter's face. Witness Two testified that he saw a person he did not recognize, and appellant going "off" to the right, shooting in the direction of Smith's apartment. Witness Two said he panicked and ran. As he looked back he saw someone on the ground being shot. Witness Two recalled that he told the police that he had taken only six steps when he heard the footsteps and the shooting.

---

[4] It appears that there are two parking lots or driveways at the apartment complex and a walkway/alley that runs between them parallel to Yosemite Street. One driveway is higher than the other so there are sets of steps in the walkway.

9

As Witness Two was running he saw Witness One coming up toward driveway one's first set of steps. Witness One said, "oh, shit" and "took off running." According to Witness Two, they ran down the stairs into driveway one. Then, Witness One ran up Yosemite Street while he ran down Yosemite toward Broadway to his car. Witness Two saw someone who said there had been a shooting.[5] Witness Two did not tell this person that he had seen the shooting because he was scared. Witness Two did not tell his sister when she telephoned him that he had seen the shooting because he did not want to worry her and did not know what might happen to her. He was scared for himself, his sister, and appellant; he considered appellant family. Witness Two said he should have gone to the police, but did not because he "didn't want to be labeled as a snitch." Witness Two said he had never been in any type of trouble and was scared of what might happen if he were labeled a snitch; he feared he would be killed or beaten up.

After talking with his sister on the telephone, Witness Two received a telephone call from appellant. Witness Two claimed that he could not recall what appellant said, nor could he recall telling the police that appellant said "hey, let's go out to the clubs" and "[w]e need to keep everything normal[.]" However, Witness Two acknowledged that when he spoke to the police he was honest and everything he told them was the truth.

Witness Two told appellant that he was by his car, which he admitted was "stupid" but he did it because he was scared. He was afraid of what appellant, or someone he called, could do to his family. A couple of minutes later, appellant picked up Witness Two and they went to Marina where they met up with Vince Stephens. They were in two cars. They went to a gas station and from there to a hotel and then the Blue Finn club. At some point, Witness Two asked appellant "why he did it" and appellant said "he did what he had to do."

---

[5] Witness Two could not recall what he said to this person because his sister was calling on his telephone.

After leaving the club, Witness Two and appellant returned to the hotel room. The next morning, they went to work where they talked about the shooting. Witness Two told appellant he needed to do the right thing and turn himself in, but he did not. Appellant said he shot Choates because Choates held his (appellant and Bugg's) baby.

Witness Two stopped working with appellant within days after the shooting because he was uncomfortable. Witness Two moved to Atlanta to live with his father because he wanted to try to get his sister and niece there and because he was scared he might be the next one to be killed. His fear was based on an incident that occurred one rainy night. Witness Two was in "the car" when appellant, who had come with a friend, asked him if he wanted to smoke some marijuana. They usually smoked in the car, but appellant asked if Witness Two wanted to go into the park. Witness Two thought that this was odd because it was raining and he feared he was getting "set up" to be shot by appellant since he knew that appellant had shot Choates.

Witness Two stayed in Atlanta for only three weeks to a month because he did not get along with his father. Witness Two went to Marina and lived with his grandparents and then from there moved to Sacramento.

Soon after the shooting, appellant talked with Witness Two about witnesses. Appellant referred to a prior conviction that he had mentioned to Witness Two before the shooting; he told Witness Two that the "only reason he got caught last time was because of a witness." This comment scared Witness Two because he had been a witness to the shooting. Witness Two interpreted appellant's comment as a threat, which meant that if he said anything his "life would be on the line."

Witness Two recalled telling the police that appellant said he should not have shot Choates; that if someone asked, he should lie and say that he was with appellant when the shooting occurred; and that he should not say anything and "if anything, to ask for a speedy trial" or "[s]omething like that."

11

When Witness Two was in Georgia, he spoke with appellant once or twice on the telephone. After Witness Two returned to California, he tried to honor his grandparents' request that he stay away from appellant, but he wanted things to appear normal and prevent appellant from thinking that he had talked to the police, which was something he had not done at the time. Witness Two was afraid that appellant might harm him, his family, or his friends. As a result, Witness Two contacted appellant a couple of times.

On the night of the shooting, Witness Two learned that Choates was the person who had been shot. Witness Two had heard that his sister and Choates used to date, but he was not around when they were dating. Witness Two had seen interactions between Choates and appellant. One time, while Witness Two and appellant were at the house of Witness Two's mother, they were sitting in front of the house when Bugg and Choates pulled up in Choates's car. Bugg got out of the car; appellant and Choates did not exchange words but rather nodded at the other. Witness Two understood this to mean "like . . . you're gonna fight." As Choates drove away he was "kind of mugging or looking to kind of intimidate." There appeared to be some hostility between appellant and Choates; appellant told Witness Two that he did not like Choates. On three or more occasions, Witness Two and appellant walked through the apartment complex after work and passed Choates; nobody exchanged any words. Witness Two said it was an uncomfortable situation knowing the history between Choates and appellant.

Witness One had never met Witness Two before the shooting, but knew who he was;[6] they both lived in the Del Monte Manor apartment complex. Witness One knew Choates and considered him to be "a little bit" of a friend.

On November 10, Witness One was outside listening to his iPod. He heard gunshots about 40 feet away. Before he heard the shots, Witness One saw Choates walking down the stairs that led from driveway two down to the walkway. Choates

---

[6]     Witness One said he knew "everybody from Seaside."

appeared to be texting on his telephone. Witness One heard the gunshots and saw Choates being shot. Witness One did not see the shooter because the shooter was "hiding behind a wall where it was dark [and] there was no light." Witness One did see an arm and a gun and that there was only one person behind the wall. Witness One saw Choates walk by the shooter and then the shooter started shooting; Witness One saw Choates fall. The shooter ran, as did Witness One. Someone was running behind Witness One but he did not know who it was. Witness One went down the hill to Yosemite Street and continued running toward Victory Temple; he was "scared of being shot." Witness One did not look back until he was in the second driveway at Yosemite Street; he saw the person running behind him. Witness One heard five, six, or seven shots, but he started running after the second shot.

When asked if he was concerned about testifying, Witness One equivocated. At first he said he was not concerned; then, he said he was concerned about "[e]verything" and that it was "personal."

Seaside Police Detective Gabriel Anderson was the lead investigator in this case. He interview Witness One on November 12. Witness One described standing nearby, hearing the shots, and looking over to see Choates struck by bullets. Witness One said that there were two people nearby when the shooting occurred. Witness One believed one of the people ran toward him, but he did not believe this was the shooter. Witness One told him that there was someone running behind him, but again he did not believe this person was the shooter.

Detective Anderson interviewed Witness One again on January 11, 2011. Witness One asked the detective a question the "gist" of which was this—"[I]f I had witnessed a murder and was able to identify or knew who did it and the people who did it knew where my family lived, would I tell the police[?]" Witness One told the detective that he did not want to be a snitch.

13

Detective Anderson showed Witness One two photographic lineups that included photographs of appellant and Witness Two. Witness One merely glanced at the lineups. Before the detective showed Witness One the lineups, Witness One said he would not be able to pick anyone out of a lineup.

Detective Anderson testified regarding the paths that Witness One and Witness Two said they took during the shooting. The two witnesses agreed that Witness Two followed Witness One until they reached Yosemite Street. However, after that point, Witness One said he went north through the Victory Outreach parking lot. There were some discrepancies in Witness Two's testimony about the direction he traveled.

In November 2010, Robert Allen lived across the street from Del Monte Manor, which was known as "the Projects." At the time of the incident, Allen was in his kitchen, which was approximately 50 feet from the edge of Del Monte Manor. He heard "a volley of almost four shots and there was a pause and then three more." Allen remained inside; he did not see anything. Based on his 21 years in the army, Allen opined that the shots sounded as if they came from the same gun.

Similarly, in November 2010, Mike Hosfelt lived across the street from Del Monte Manor a few doors away from Allen. On November 10, Hosfelt "heard four shots and then a pause and then three more." The pause lasted "roughly five, six seconds and then they started firing again." The shots sounded as if they came from the same gun. Hosfelt saw two men running from driveway one to Yosemite Street heading away from Broadway.

Twenty-three year old Vince Stephens had known appellant since elementary school; he considered him a good friend. Stephens had known Witness Two since high school. Stephens had known Witness One for a few years, but they were not good friends. Around 9:00 or 10:00 p.m. on Wednesday, November 10, 2010, Stephens went to the Blue Finn club on Cannery Row with appellant and Witness Two. Stephens was in

14

Marina when he was picked up by Witness Two and appellant. Stephens said he was "pretty sure" he knew about the shooting before he was picked up.

Stephens said that he knew Choates and his family "pretty well"; but he did not know Choates well enough to call him a good friend. Stephens could not recall whether the shooting was discussed in the car or at the club. However, he said that he had never known appellant to carry a gun and had never seen him holding one. Stephens knew that Bugg and Choates had had some type of relationship.

On cross-examination, Stephens testified that appellant seemed to be his "normal self" when they were in the car on the night of the shooting. Appellant was outgoing, listening to music and laughing and talking. Stephens was with appellant the whole evening and did not smell any gunpowder on him or see any blood on his clothes. Witness Two did not act odd or unusual that day.

Several Seaside police officers testified about the shooting scene and the events that occurred after they arrived, and the next day. Officer Daniel Charlton saw Choates lying on the "concrete causeway" with a woman near him; Choates's father was nearby. There were approximately 15 to 20 people in the area. Choates was conscious, but had suffered significant blood loss and appeared to be struggling to breathe. Sergeant Dias suggested that Officer Charlton speak to Choates and try to find out who shot him. Officer Charlton and Choates's father asked Choates if he could tell them who shot him; all Choates muttered was that he could not breathe or it was hard to breathe. Officer Charlton went to the hospital and stood nearby as the doctors tried to save Choates. Officer Charlton was present when Choates was pronounced dead about an hour or less after the shooting. Choates did not say anything more.

Officer Kevin Miller testified he helped to secure the crime scene and looked for and found some shell casings with Sergeant Dias. Officer Miller found Choates's car in the 1500 block of Yosemite Street, near driveway two. Officer Miller testified that Choates's car would have been visible from appellant's apartment.

15

Sergeant Dias helped secure the scene. He heard Choates say that he could not breathe when Officer Charlton tried to question him. Sergeant Dias processed the scene and found six 9-millimeter casings.

Sergeant Nicholas Borges assisted Detective Anderson in clearing the crime scene and with follow-up. The day after the shooting he returned to the apartment complex and found a bullet that had ended up in an apartment bathroom. Sergeant Borges obtained a video surveillance recording that showed that appellant had arrived at the Alliance gas station at 10:12 p.m. and at the Blue Finn club at 10:58 p.m.

Evidence technician Christine Rosa processed the crime scene and collected evidence, which included six 9-millimeter shell casings found the night of the shooting. Another shell casing was found the next morning near a tree and was collected by a detective, who also removed a bullet slug from a bathroom.

Dr. John Hain, a forensic pathologist with the Monterey County Coroner's Office conducted the autopsy on Choates's body on November 12, 2010. According to Dr. Hain, Choates was shot multiple times and this was the cause of death. Dr. Hain stated that it was difficult to determine how many times Choates had been shot because there were "a lot of penetrating ones that looked like they were caused by fragmenting projectiles" or "shrapnel wounds." Choates had been hit "by four separate bullets, plus these fragmented bullets. So maybe considerably more than that number of bullets may have hit him." A bullet entered the back of the left hand and exited through the palm; a bullet entered the inner aspect of the right forearm near the elbow and exited the outer aspect of the right forearm near the elbow; a bullet entered the outer aspect of the left back, went through the soft tissue and exited through the left back about three inches from where it entered; a bullet entered at the junction of the buttocks and the back on the left side, penetrated into the middle of the pelvis, and struck the inferior vena cava—the largest vein that drains back to the heart—causing massive internal bleeding—this wound would have been fatal within a few minutes; a bullet entered the left thigh, hit soft tissue

16

and exited out the back of the left thigh—this wound was potentially life-threatening because it caused a lot of bleeding; there were possible reentry wounds of shrapnel that entered the back of each calf; and there were broad areas of shrapnel injury around the left elbow and a few small wounds on the front of the left shoulder. Choates's toxicology report was negative for any kind of drug abuse or alcohol.

On both state and federal constitutional grounds, appellant claims that there was insufficient evidence to support his conviction for first degree murder and the lying-in-wait special circumstance allegation. Specifically, he contends that the evidence was deficient because it failed to establish his identity as the shooter; the evidence does not support his conviction for first degree murder based on a theory of premeditation and deliberation; and the evidence does not support his conviction for first degree murder based on a theory of lying in wait and the lying-in-wait special circumstance. We are not persuaded by appellant's arguments.

*Identity of the Shooter*

Under the substantial evidence test set forth in *Johnson*, *supra*, 26 Cal.3d at page 578, "the probative value of the identification and whatever other evidence there is in the record are considered together to determine whether a reasonable trier of fact could find the elements of the crime proven beyond a reasonable doubt." (*People v. Cuevas* (1995) 12 Cal.4th 252, 274.)

We note that "[c]onflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.) Reversal on the ground that there is insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there

17

sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

The testimony of a single witness is sufficient to support a conviction unless the testimony is physically impossible or inherently improbable. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Throughout his briefs appellant repeatedly tries to discredit Witness Two's identification of him as the shooter. However, appellant was not a stranger to Witness Two—they were best friends who worked together and socialized with each other on a regular basis; appellant was the father of Witness Two's niece and he and appellant had lived together for "quite some time" at the house of Witness Two's mother. Courts have held that it is not necessary that any witness called to identify the accused should have seen his face. (*In re Corey* (1964) 230 Cal.App.2d 813, 826.) "Identification may be based on other peculiarities such as size, appearance, similarity of voice, features or clothing." (*Ibid*.)

At least four times, appellant argues that because Witness Two never saw the shooter's face his identification of him as the shooter was based on "mere inference, speculation and conjecture." We disagree. Moments before the shooting, Witness Two and appellant shared a cigarette in the walkway/alley. Witness Two turned to walk away, took six steps and then heard footsteps followed by "a lot of" gunshots, "maybe about in between six, seven." When he turned around, he saw appellant shooting, and he saw the "flashes from the gun"; appellant was no longer sitting where he had been when they smoked a cigarette together. Witness Two testified that he saw appellant "shooting from right to left." When asked if he was positive that it was appellant that was shooting, Witness Two responded, "Man I'm positive. I don't want to be here. Especially, I don't want to do this." He was "[a] hundred percent" certain that it was appellant. We find nothing physically impossible or inherently improbable in Witness Two's testimony. The only other person who was in the area of the shooting was Witness One who was coming toward Witness Two.

18

Finally, appellant's admissions to Witness Two that "he did what he had to do" and he did it because Choates held his baby, provided strong circumstantial evidence that appellant was the shooter.

Any claimed weakness in Witness Two's identification because Witness Two did not see the shooter's face at the time he was shooting because he had a hood on was a matter for argument to the jury, and cannot be effectively urged on appeal. (*People v. Farrington* (1931) 213 Cal. 459, 463.) "On the question of identification of the perpetrator of the crime, it has been repeatedly held by the courts of this state that such a question is essentially one for determination by the triers of fact, and that their verdict or decision will not be set aside unless the appellate court can say as a matter of law that there was no substantial evidence to support the conviction. [Citations.] Unless it can be said that the evidence of identity was so weak as to constitute practically no evidence at all, an appellate court is not entitled to set aside a jury's finding of guilt. [Citation.]" (*People v. Alexander* (1949) 92 Cal.App.2d 230, 234.) In the instant case appellant has not met the burden imposed upon him to show that the identification evidence is inherently unbelievable.

As Witness Two posited it in a rhetorical question during cross-examination, "if I was [*sic*] behind you and I'm the last person you seen and I reach in your pocket and I'm quick . . . by the time you turn[] around, I'm not doing anything, who would you suspect?" Far from being mere speculation and conjecture, appellant's identification as the shooter was based on Witness Two's knowledge that moments before the shooting appellant had been in the alley/walkway and when Witness Two turned after he heard the gunshots, after taking only six steps, appellant was no longer on the box and the shooter, who was dressed exactly the same as appellant had been dressed was firing at Choates. Witness Two's positive identification of appellant as the shooter was compelling evidence on the issue of identity.

19

*Premeditation and Deliberation*

In essence, appellant argues that even if this court finds substantial evidence that he was shooter, there is not substantial evidence that he committed a first degree murder with premeditation and deliberation.

"First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty. [Citation.] That mental state is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death. [Citations.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 166.)

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.]' [Citation.] ' " Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " [Citation.]' [Citations.]" (*People v. Solomon* (2010) 49 Cal.4th 792, 812 (*Solomon*).)

"*People v. Anderson* (1968) 70 Cal.2d 15 . . . (*Anderson*) discusses three types of evidence commonly shown in cases of premeditated murder: planning activity, preexisting motive, and manner of killing. [Citation.]" (*Solomon, supra*, 49 Cal.4th at p. 812.) However, " '*Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation.' [Citations.]" (*Ibid.*)

Appellant contends that "[g]iven the absence of substantial and reliable evidence to support a finding that [he] engaged in significant pre-killing planning activity, to support a finding that he had a motive to kill Mr. Choates, and to support a finding that

20

the manner of the killing was pursuant to a preplanned design to deliberately kill, there was not substantial [evidence] to support [his] conviction for first degree murder based on premeditation and deliberation." We disagree.

The jury could reasonably have inferred from the evidence that appellant's motive for the killing was jealousy over what appellant perceived to be Bugg's ongoing relationship with Choates and anger that Choates had held his baby. As to planning activity, the record shows that appellant, who did not normally carry a gun, had one on the day of the shooting. Appellant's arming of himself with a gun shows planning activity. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1081-1082.) There was evidence that the victim's car was visible from appellant's apartment; and based on appellant's jailhouse telephone conversation with Bugg, in which he mentioned the wine coolers, it can be inferred that appellant knew Choates was at Smith's apartment. Appellant sat on a box with a large jacket and hood on, even though he was supposed to be going out to a club with Witness Two and waited in a place close to his apartment and Smith's apartment. From this the jury could reasonably have inferred that appellant waited for an opportunity to ambush Choates.

Further, as appellant concedes, the manner of the killing is evidence of an intent to kill. Here, the evidence showed appellant fired four shots from a short distance and then while Choates was on the ground fired three more. "The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . ." [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 734, 741.)[7] Such actions especially support a finding of premeditation where the victim is unarmed and in an isolated location with the assailant. (*People v. Silva* (2001) 25 Cal.4th 345, 369.) Appellant's argument that the manner of killing does not suggest premeditation and deliberation—

_____

[7]     Here, of course, at least one bullet did inflict a mortal wound.

random gunshots that were not directed at vital areas of Choates's body—might have had more force if appellant had shot only once in Choates's direction rather than shooting into Choates while he was on the ground. Even where the assailant did not initially plan the fatal encounter with the victim, his use of a firearm against a defenseless person may show sufficient deliberation to support a verdict of guilt of first degree murder. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332.)

In sum, we find ample evidence of premeditation and deliberation.

*Lying in wait*

The prosecution's main theory in this case was that it was a premeditated and deliberate murder. However, the prosecutor argued that in the alternative the jury could find appellant guilty of first degree murder on the theory that appellant was lying in wait for Choates.[8] In addition, the prosecution alleged a lying-in-wait special circumstance. Appellant contends that there was not substantial evidence to support his conviction for first degree murder based on lying in wait; but even if there was, there was not substantial evidence that he committed an intentional murder by means of lying in wait.

" 'The requirements of lying in wait for first degree murder under Penal Code section 189 are "slightly different" from the lying-in-wait special circumstance under Penal Code section 190.2, subdivision (a)(15). [Citation.] . . . We focus on the special circumstance because it contains the more stringent requirements. [Citation.] If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder. [¶] The lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and

---

[8] "[L]ying in wait as a theory of murder is 'the functional equivalent of proof of premeditation, deliberation and intent to kill' [citations]; . . . 'a showing of lying in wait obviates the necessity of separately proving premeditation and deliberation . . . .' [Citation.]" (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1149, fn. 10 (*Gutierrez.*)

22

(3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .” [Citations.] “The element of concealment is satisfied by a showing ‘ “ that a defendant’s true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim. ” ’ ”[Citation.]’ [Citations.]” (*People v. Moon* (2005) 37 Cal.4th 1, 22 (*Moon*); see also *People v. Stevens* (2007) 41 Cal.4th 182, 202 (*Stevens*).)[9]

---

[9]    In 2000, Proposition 18 changed the requirement of a killing “ ‘while’ ” lying in wait to one committed “ ‘by means of’ ” lying in wait. (*People v. Lewis* (2008) 43 Cal.4th 415, 512, fn. 25, disapproved on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) Before this change, the requirements of the lying-in-wait special circumstance were slightly different from, and more stringent than, the requirements for lying in wait first degree murder. (See, e.g., *Gutierrez*, *supra*, 28 Cal.4th at pp. 1148-1149.) Whereas lying in wait first degree murder required only that the murder be perpetrated “by means of” lying in wait (§ 189), the lying-in-wait special circumstance applied to murder committed “*while* lying in wait” (§ 190.2, former subd. (a)(15), italics added). The California Supreme Court interpreted the special circumstance as requiring “ ‘that the killing take place *during the period of concealment and watchful waiting*.’ ” (*Gutierrez*, *supra*, at p. 1149.) “Proposition 18, adopted by the voters on March 7, 2000, changed the word ‘while’ in the lying-in-wait special circumstance to ‘by means of’ so that it would conform with the lying-in-wait language defining first degree murder to essentially eliminate the immediacy requirement that case law had placed on the special circumstance. [Citations.] The Legislative Analyst’s analysis of Proposition 18 in the ballot pamphlet noted that the courts had ‘generally interpreted [while lying in wait] to mean that, in order to qualify as a special circumstance, a murder must have occurred immediately upon a confrontation between the murderer and the victim. The courts have generally interpreted this provision to rule out a finding of a special circumstance if the defendant waited for the victim, captured the victim, transported the victim to another location, and then committed the murder.’ [Citation.] The analysis further stated: ‘This measure amends state law so that a case of first degree murder is eligible for a finding of a special circumstance if the murderer intentionally killed the victim “by means of lying in wait.” In so doing, this measure replaces the current language establishing a special circumstance for murders committed “while lying in wait.” This change would permit the finding of a special circumstance not only in a case in which a murder occurred immediately upon a confrontation between the murderer and the victim, but also in a case in which the murderer waited for the victim, captured the victim, transported the victim to another location, and then committed the murder.’ [Citation.]” (*People v. Superior Court* (*Bradway*) (2003) 105 Cal.App.4th 297, 307-308.) CALCRIM No. 728 appears to (continued)

23

A sufficiency-of-the-evidence challenge to a special circumstance finding is reviewed under the same test applied to a conviction. (*Stevens*, *supra*, 41 Cal.4th at p. 201; *Moon*, *supra*, 37 Cal.4th at p. 22.)

Here, the court instructed the jury pursuant to CALCRIM No. 728 that for them to find true the lying-in-wait special circumstance, the prosecution had to prove that "1. The defendant intentionally killed Dwayne Jay Choates, Jr.; [¶] AND [¶] 2. The defendant committed the murder by means of lying in wait. [¶] A person commits a murder by means of lying in wait if: [¶] 1. He or she concealed his or her purpose from the person killed; [¶] 2. He or she waited and watched for an opportunity to act; [¶] 3. Then he or she made a surprise attack on the person killed from a position of advantage; [¶] AND [¶] 4. He or she intended to kill the person by taking the person by surprise. [¶] The lying in wait does not need to continue for any particular period of time, but its duration must be substantial and must show a state of mind equivalent to deliberation or premeditation. [¶] The defendant acted deliberately if he carefully weighed the considerations for and against his choice, and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death. [¶] The concealment can be accomplished by ambush or some other secret plan."

The testimony at trial established the elements of the lying-in-wait special circumstance. Appellant was sitting in the alleyway ostensibly smoking a cigarette; he was wearing a large jacket and had a hood on. Anyone walking by would have assumed that he was just there smoking. Witness Two testified that the gun was not visible when he spoke with appellant. Accordingly, appellant concealed his purpose as he waited and watched for an opportune moment to attack Choates. As we have explained *ante*, "[t]he

---

reflect this change. In this case, appellant did kill Choates immediately after watching and waiting.

24

element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' [Citations.]" (*People v. Sims* (1993) 5 Cal.4th 405, 432-433.)

As to the second element of the lying-in-wait special circumstance, we do not know how long appellant had been sitting on the box, but he was there with Witness Two for as long as it took to share a cigarette; Witness Two estimated he was with appellant for at least a couple of minutes. "The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citations.] This period need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' [Citation.]" (*Stevens*, *supra*, 41 Cal.4th at p. 202.) As noted *ante*, appellant, who did not normally carry a gun, had one on the day of the shooting and sat in a position where he would be able to see Choates on his way back to his car from Smith's apartment no matter which way Choates walked to Yosemite Street.[10] Within seconds after Choates left Smith's apartment, appellant began shooting at him. There was evidence that the victim's car was visible from appellant's apartment; and based on appellant's jailhouse telephone conversation with Bugg, in which he mentioned the wine coolers, it can be inferred that appellant knew Choates was at Smith's apartment. Appellant did not have to wait long before Choates came along, but the facts of this case establish that he was watching and waiting for his opportunity to attack Choates. Even a short period of watching and waiting can negate any inference that appellant killed as a result of rash impulse. (*Moon*, *supra*, 37 Cal.4th at p. 24.)

---

[10] We have reviewed the crime scene video and note that the box on which appellant was sitting was the perfect place to "hang out" while waiting for someone to leave Smith's apartment, especially if that person had left his car on Yosemite Street.

It does so in this case. The California Supreme court has "never required a certain minimum period of time, only a period not insubstantial." (*People v. Edwards* (1991) 54 Cal.3d 787, 823.) The *Edwards* court upheld a lying-in-wait special circumstance where the period of watching and waiting was a matter of minutes (enough time to walk a quarter of a mile), finding "[t]his was substantial." (*Id*. at pp. 825-826.)

Appellant stopped watching and waiting and then he acted quickly once he had opportunity so to do. Within seconds of Choates leaving the apartment, appellant began shooting at him while Choates was looking at his telephone; appellant had moved from his position on the box, where a casual observer would have assumed he was just smoking a cigarette and quickly got into a position behind a wall from where he shot Choates. A rational jury could infer that appellant did not kill out of rash impulse, but rather in a purposeful manner that required stealth and maneuvering to gain a position of advantage over the unsuspecting Choates. Choates could not have anticipated appellant's deadly intentions. "The factors of concealing murderous intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by [means of] lying in wait.' [Citation.]" (See, *Stevens*, *supra*, 41 Cal.4th at p. 202.)

Since we have concluded *ante* that the manner of the killing evidenced intent to kill, we find all the elements of the lying-in-wait special circumstance to be supported by substantial evidence.

Having determined that substantial evidence supported the lying-in-wait special circumstance finding, we conclude the evidence necessarily supports the conviction of lying in wait first degree murder. (*Moon*, *supra*, 37 Cal.4th at p. 24.)

*Instructional Error—CALCRIM No. 358*

The court instructed the jury pursuant to CALCRIM No. 358 as follows: "You have heard evidence that the defendant made oral or written statements before the trial. You must decide whether the defendant made any of those statements in whole or in part. [¶] If you decide that the defendant made such statements, consider the statements along

26

with all the other evidence in reaching your verdict. It is up to you to decide how much importance to give to the statements."

The trial court did not give the bracketed portion of CALCRIM No. 358, which states: *"Consider with caution any statement made by . . . defendant tending to show his . . . guilt unless the statement was written or otherwise recorded."* (Judicial Council of California Criminal Jury Instructions, CALCRIM No. 358 (2014 rev.) p. 124, italics added, brackets and parentheses omitted.)

A trial court has a sua sponte duty to instruct the jury that it must view evidence of a defendant's oral admissions with caution. (*People v. Dickey* (2005) 35 Cal.4th 884, 905 (*Dickey*).) Since witnesses may inaccurately report a defendant's statements, the purpose of the cautionary instruction is to assist the jury in determining if the statement was in fact made. (*Ibid.*; *People v. Bemis* (1949) 33 Cal.2d 395, 399.)

Appellant contends and the People concede that the court should have given the bracketed portion of CALCRIM No. 358 with respect to appellant's "alleged oral admission to Witness #2 who reported them to Detective Anderson during his interview on December 27, 2010, and testified about them at trial."

Witness Two told Detective Anderson that when appellant telephoned him and asked if he was ready to go to the club, appellant volunteered that he shot Choates because he had held appellant and Bugg's baby. Witness Two testified that he had many conversations with appellant about the murder and about appellant's prior conviction for robbery. According to Witness Two, when he asked appellant why he killed Choates, appellant said "he did what he had to do" and the reason was because Choates held the baby. Appellant said that he did not like Choates, he expressed regret for shooting him and asked Witness Two to provide him a false alibi—say that they were together at the time of the shooting. In addition, appellant told him that the only reason he was caught for robbery was that there was a witness.

27

The failure to tell the jury to view the evidence of the defendant's admissions with caution does not require reversal unless the defendant shows it is reasonably probable the outcome would have been more favorable had the instruction been given. (*Dickey*, *supra*, 35 Cal.4th at p. 905.) Other instructions, including thorough instructions on assessment of witness credibility, may adequately alert the jury to view the evidence of defendant's omissions with caution so as to make the instructional omission harmless. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 680 (*McKinnon*); *People v. Wilson* (2008) 43 Cal.4th 1, 19, 20.)

Thus, "[i]n determining whether the failure to instruct requires reversal, '[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given.' [Citations.] ' "Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]" ' [Citations.]" (*McKinnon*, *supra*, 52 Cal.4th at pp. 679-680.) Our Supreme Court has held that the erroneous omission of the cautionary language is harmless when, in the absence of such conflict, a defendant simply denies that he made the statements.[11] (See *Dickey*, *supra*, 35 Cal.4th at p. 906.) Further, when the trial court has otherwise thoroughly instructed the jury on assessing the credibility of witnesses, our Supreme Court has concluded the jury was adequately warned to view their testimony with caution. (*Id*. at pp. 906-907.)

The instructions on witness credibility that the court gave told the jurors that they alone must judge the believability of the witnesses, and set forth a lengthy, detailed list of

---

[11]     Since appellant's defense was that it was not he who had shot Choates, implicitly, he was denying that he made the statements.

the factors the jury should consider, including a witness's ability to perceive and remember, bias, consistency, prior statements, and reasonableness as compared to other evidence. (See CALCRIM Nos. 226, 318.) These instructions alerted the jury to critically evaluate the evidence provided by Witness Two, which would include the testimony and statements that he said appellant made. The jury also knew from the instructions that appellant was presumed innocent, that the prosecution had to prove him guilty beyond a reasonable doubt, (see CALCRIM No. 220) and that circumstantial evidence could not be relied upon to conclude that a fact has been proven unless the prosecution has proven each fact essential to the conclusion beyond a reasonable doubt (see CALCRIM No. 224). From these instructions on the burden of proof and circumstantial evidence, the jurors would have understood that they should not rely on the evidence of appellant's statements unless they were convinced that the statements were firmly established by the evidence.

Given the detailed instructions telling the jury to consider numerous factors when making its credibility determinations and to acquit unless guilt was proven beyond a reasonable doubt, appellant has not shown it is reasonably probable the jury would have reached a different result had it been explicitly told to view his admissions with caution.

*Instructional Error—CALCRIM No. 359*

Without any objection from either party the court instructed the jury pursuant to CALCRIM No. 359 as follows: "The defendant may not be convicted of any crime based on his out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude . . . that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that the crime was committed. [¶] The identity of the person who committed the crime . . . may be proved by the defendant's statements alone. [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."

29

Appellant contends that the trial court erred in giving CALCRIM No. 359 because it, in conjunction with CALCRIM No. 358, allowed the jury to use his "untested and unrecorded extrajudicial statements alone to find him guilty of first degree murder and [find] the special circumstance true." Appellant argues that "giving CALCRIM No. 359 under the circumstances of this case violated his federal constitutional rights to due process and/or trial by jury" and also "constituted state law error that requires reversal of the entire judgment." The People disagree, as do we.

CALCRIM No. 359 expresses the corpus delicti rule, instructing the jury not to base any true finding on a defendant's out-of-court statement alone: "[T]he prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169; see *People v. Reyes* (2007) 151 Cal.App.4th 1491, 1498.) "The independent proof [of the corpus delicti] may be circumstantial and need not be beyond a reasonable doubt . . . ." (*People v. Alvarez, supra*, at p. 1171.) "In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered . . . to strengthen the case on all issues." (*Ibid.*)

In *People v. Rivas* (2013) 214 Cal.App.4th 1410 (*Rivas*), this court identified a risk of confusion in CALCRIM No. 359. Specifically, we stated that "the reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALCRIM No. 359, 3d par.), which to any juror can only mean the defendant's identity as the perpetrator, i.e., the guilty party." (*Rivas, supra*, at

30

p. 1429, fn. omitted.) We concluded that the "instruction requires reconsideration."
(*Ibid.*)

Ultimately, in *Rivas*, we concluded the instructional error was harmless. (*Rivas*, *supra*, 214 Cal.App.4th at pp. 1429-1430.) We so conclude in this case. Whether viewed alone or in conjunction with CALCRIM No. 358, any conceivable error caused by the instruction could not have misled the jury.

The jury was told more than once that it could find appellant guilty of the charged crime only if it was convinced beyond a reasonable doubt that he committed it. Not only did CALCRIM No. 359 inform them of this, but also the court instructed with CALCRIM No. 220, which informed the jury that it must consider all the evidence and find appellant not guilty unless the prosecution proved him guilty beyond a reasonable doubt.[12] Since other strong evidence pointed to appellant's guilt, the error in giving CALCRIM No. 359 did not so badly infect the entire trial that reversal is required. Similarly, under the state law prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, there is no reasonable probability that absent the error the outcome would have been more favorable to appellant.

In short, there was overwhelming evidence of appellant's guilt—as discussed *ante* in detail—including Witness Two's positive identification of appellant as the shooter.

*Failure to Give a Voluntary Manslaughter Instruction*

"A trial court must instruct on all lesser included offenses supported by substantial evidence. [Citations.] The duty applies whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense. [Citations.] That voluntary manslaughter is a lesser included offense of

---

[12] " 'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole, and not in isolation. [Citation.]' " (*People v. Moore* (2011) 51 Cal.4th 1104, 1140.)

31

murder is undisputed. [Citations.]" (*People v. Duff* (2014) 58 Cal.4th 527, 561 (*Duff*).) By instructing on all crimes for which there is substantial evidence, "the trial court's action will avoid an unwarranted all-or-nothing choice for the jury and will ensure that the verdict is no harsher or more lenient than the evidence merits." (*People v. Wickersham* (1982) 32 Cal.3d 307, 324, disapproved on another ground *People v. Barton* (1995) 12 Cal.4th 186, 201.)

Substantial evidence is evidence from which a jury composed of reasonable persons could conclude that the defendant committed the lesser offense, but not the greater. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Id*. at p. 177.) In particular, "courts should not evaluate the credibility of witnesses, a task for the jury." (*Id*. at p. 162.) "The testimony of a single witness . . . can constitute substantial evidence requiring the court to instruct on its own initiative." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

Conversely, the "substantial evidence requirement is not satisfied by " ' *any* evidence . . . no matter how weak,' " but rather by evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." [Citation.]" (*People v. Verdugo* (2010) 50 Cal.4th 263, 293.)

"Heat of passion, which . . . reduces murder to voluntary manslaughter, arises when the defendant is provoked by acts that would 'render an ordinary person of average disposition "liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment" ' [citation] and kills while under the actual influence of such a passion [citation]." (*Duff*, *supra*, 58 Cal.4th at p. 562.)

Although no specific type of provocation is required (*People v. Berry* (1976) 18 Cal.3d 509, 515), the court may resolve the question when the provocation is so slight or so severe that reasonable jurors could not differ on the issue of adequacy. (*People v. Brooks* (1986) 185 Cal.App.3d 687, 693.)

Appellant is correct that if substantial evidence supported his heat of passion theory, the trial court was obligated to agree to instruct on voluntary manslaughter.

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense of voluntary manslaughter should have been given." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

The requested instruction, CALCRIM No. 570, would have provided: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear

33

reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.] [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder." (Judicial Council of Cal. Criminal Jury Instructions (2014 edition), CALCRIM No. 570 pp. 315-316.)

Thus, heat of passion arises if, " 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' [Citations.]" (*People v. Barton*, *supra*, 12 Cal.4th at p. 201.) "Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).)

In *Beltran*, our Supreme Court noted that "[t]o be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Beltran*, *supra*, 56 Cal.4th at p. 949.) In other words, "the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*Ibid*.)

"[C]ase law and the relevant jury instructions make clear the extreme intensity of the heat of passion required to reduce a murder to manslaughter. This passion must be a ' " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citation].' [Citation.]" (*Beltran*, *supra*, 56 Cal.4th at p. 950.)

As did the trial court, we find no evidence of heat of passion. That appellant may have been jealous of Bugg's relationship with Choates, while providing a motive for the

34

murder, is not sufficient standing alone to require an instruction on voluntary manslaughter.  The heat-of-passion element of voluntary manslaughter has an objective and subjective component.  (*People v. Enraca* (2012) 53 Cal.4th 735)  "Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  (*Id*. at p. 759.)  "Subjectively, 'the accused must be shown to have killed while under "the actual influence of a strong passion" induced by such provocation.'  [Citation.]"  (*Ibid*.)  In this case, there was no evidence that Choates did anything.  Appellant has not and cannot point to anything that could be considered as sufficiently provocative behavior by Choates.

Even if a heat-of-passion defense theory had been supported by substantial evidence, we would find the trial court's error in failing to instruct on that theory harmless in view of the jury's special circumstance finding that appellant had intentionally killed Choates by means of lying in wait.  The "special circumstance finding[ ] . . . negate[s] any possibility that [appellant] was prejudiced from the failure to instruct on [the] provocation/heat of passion . . . theor[y] of manslaughter."  (*People v. Cruz* (2008) 44 Cal.4th 636, 665.)

*Instructional Error—First Degree Murder—Alleged Unsupported Theories*

In denying appellant's request for an instruction on voluntary manslaughter the court stated, "Well, we actually don't have any evidence that the defendant knew the victim was at Ms. Smith's house.  I just see no evidence that would support that particular jury instruction or charge."

Citing *People v. Guiton* (1993) 4 Cal.4th 1116, 1129, appellant contends, "The trial court erred by instructing the jury regarding first degree murder because those instructions were based on unsupported theories . . . ."  He asserts that "[g]iven the absence of evidence to warrant instructions premised on such knowledge and the related

35

plan to act on that knowledge, the trial court erred by instructing the jury on principles of law that had no application to the facts."

In *Guiton*, the California Supreme Court held that "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case. [Citation.]" (*People v. Guiton*, *supra*, 4 Cal.4th at p. 1129.)

Appellant's position is premised on his assertion that the court "expressly found no evidence that [appellant] knew of Mr. Choates' presence at the apartment complex."

While we find Judge Butler's choice of words to be unfortunate, we do not believe that she was expressly finding that there was no evidence that appellant knew of Mr. Choates's presence at the apartment complex. Rather, we believe that she meant there was no *direct* evidence to support such a finding. Indeed, during appellant's new-trial motion, when he argued that there was insufficient evidence to support the lying-in-wait special circumstance, Judge Butler rejected the argument. Judge Butler found that "[i]n regards to the lack of evidence that the defendant knew that the victim was in the apartment, there is circumstantial evidence to indicate knowledge. The victim's car was parked on the street. That particular area could be seen from the defendant's apartment. We have information from the friend that the defendant's girlfriend was at her friend's apartment. Her ex-boyfriend was there. I believe the friend testified the girlfriend went back, got some wine coolers, came back and they had a wine cooler. [¶] . . . [¶] I do find the verdicts of the jury are appropriate, well reasoned and supported by the evidence." Such a position is totally inconsistent with an actual finding that "we actually don't have any evidence that the defendant knew the victim was at Ms. Smith's house." Thus, it is apparent from the record that the trial court's comment was not a binding finding of fact.[13] As such, as detailed *ante*, there was substantial

---

[13]     In fact, in closing, defense counsel argued that there was no evidence that appellant knew that Choates was in Smith's apartment and in rebuttal the prosecutor (continued)

circumstantial evidence to warrant instructions premised on appellant's knowledge that Choates was in Smith's apartment and the related plan to act on that knowledge.

*Cumulative Error*

Appellant contends that the cumulative effect of the errors discussed *ante*, "rendered his trial fundamentally unfair and requires the reversal of the entire judgment."

Reversal based on cumulative error is required only if a high number of instances of error occurring at trial create a strong possibility that "the aggregate prejudicial effect of such errors was greater than the sum of the prejudice of each error standing alone." (*People v. Hill* (1998) 17 Cal.4th 800, 845.) For instance, in *Hill*, at pages 844 through 847, the court concluded that the cumulative impact of constant and outrageous misconduct by the prosecutor and several legal errors occurring at trial, "created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors." (*Id*. at p. 847.)

Certainly, " '[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.) The combined effects of multiple errors may indeed render a trial fundamentally unfair. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.) However, as discussed *ante,* since we have found none of appellant's claims of error meritorious and/or prejudicial, a cumulative error argument cannot be sustained. No serious errors occurred, which whether viewed individually or in combination, could possibly have affected the jury's verdict. (*People v. Martinez* (2003) 31 Cal.4th 673, 704.) Simply put, since we have found no substantial error in any respect, appellant's claim of cumulative prejudicial error must be rejected. (*People v.*

argued the evidence was there to support an inference that appellant knew Choates was in Smith's apartment. Had the court made a binding finding of fact that there was no evidence that appellant knew that Choates was in the apartment, such argument would have been redundant.

37

*Butler* (2009) 46 Cal.4th 847, 885.)  Appellant was entitled to a fair trial, not a perfect one.  (*People v. Bradford* (1997) 14 Cal.4th 1005, 1057.)

*Disposition*

The judgment is affirmed.

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.